**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| Annabel B., Levi B., and Kimberly F., minors, by Next Friend Brian WILSON; Miles M., minor, by Next Friend Jenna HULLET; Joshua J., minor, by Next Friend Meghan BARTELLS; Nigel M., Ashley M., and Matthew M., minors, by Next Friend Kristy LONG; Sophia P., minor, by Next Friend Alicia PRATT, | |
| | Case No. ___3:23-cv-760___ |
|                    Plaintiffs, | |
|    v. | **CLASS ACTION COMPLAINT** |
| Eric HOLCOMB, in his official capacity as the Governor of Indiana; Eric MILLER, in his official capacity as the Director of the Indiana Department of Child Services; and the INDIANA DEPARTMENT OF CHILD SERVICES, | |
|                    Defendants. | |

       Named Plaintiffs Annabel B., Levi B., Kimberly F., Miles M., Joshua J., Nigel M., Ashley M., Matthew M., and Sophia P., ("Plaintiffs") bring this class action for declaratory and injunctive relief against Defendants Indiana Department of Child Services; Eric Miller, Director of DCS; and Eric Holcomb, Governor of Indiana (collectively, "Defendants").

       The Named Plaintiffs are children in foster care in Indiana. They bring this lawsuit as a civil rights action on behalf of all children who are now, or will be, in the custody of DCS.[1]

---

[1] The named Plaintiff children and any other minors mentioned by name in this Complaint all appear by pseudonyms with the same first and last initials as their real names.

1

## PRELIMINARY STATEMENT

1.      When Indiana takes custody of an abused or neglected child, it becomes responsible for that child's care and safety. Indiana's Department of Child Services ("DCS") was created to protect the state's most vulnerable children. But Indiana is failing in its most fundamental duty as custodian – keeping foster children safe and healthy. The very system that was designed to protect foster children often compounds their trauma and causes lifelong harm. By failing to provide the children in its custody with reasonable care and safety, Indiana violates those children's rights under the U.S. Constitution and federal law.

2.      In her resignation letter to Governor Eric Holcomb, former DCS Director Mary Beth Bonaventura warned that then-Chief of Staff, Eric Miller, was "the greatest threat to this agency and child welfare." Bonaventura explained: "I have effectively been stripped of the power to run DCS for the past 11 months. Staff from your office chose a chief of staff with no child welfare experience who had been 'an asset during the campaign.' The current chief of staff has engineered the hiring of his choices, driven out career professionals, engaged in bullying subordinates, created a hostile work environment, exposed the agency to lawsuits, overridden my decisions, been brazenly insubordinate, and made cost cutting decisions without my knowledge or regard for the consequences . . . [he] is bent on slashing our budget in ways that all but ensure children will die. Any attempts I have made to rein him in on non budgetary issues have likewise not been supported; I am truly the DCS director in name only. The current chief of staff, with the position and authority he has been given by your office, is the greatest threat to this agency and child welfare."

3.      In May 2023, Governor Holcomb promoted "the greatest threat to this agency and child welfare" to the position of DCS Director.

2

4.      DCS's systemic failures are well-known to state officials. Independent investigations have detailed DCS's systemic failures for decades. Federal investigators have identified critical failures in DCS's administration of Indiana's child welfare system. State and federal data indicate that Indiana's foster children are languishing in state custody longer than ever before. The state's refusal to correct these well-documented failures leaves Indiana's most vulnerable children at substantial risk of serious and unconstitutional harm.

5.      Defendants' actions, inactions, policies, and practices that threaten the basic care and safety of foster children include, but are not limited to:

    a.  Failure to keep children in foster care safe;

    b.  Failure to recruit and retain an adequate number of caseworkers;

    c.  Failure to recruit and retain an adequate number of foster homes;

    d.  Failure to provide timely and appropriate medical treatment;

    e.  Failure to implement measures necessary to ensure permanency within a reasonable period of time;

    f.  Failure to implement measures necessary to ensure placement stability;

    g.  Failure to maintain and update medical records, and failure to provide full and accurate medical information to foster parents; and

    h.  Failure to maintain an adequate diversity of placements to permit children with disabilities to reside in the most integrated, least restrictive, and most family-like environment.

6.      Under the U.S. Constitution and federal law, children for whom the state has assumed responsibility have the right to be free from physical and psychological harm.

7.      The subclass of children who have or will have emotional, psychological, cognitive, or physical disabilities are further entitled to be free from discrimination based on their disabilities under the Americans with Disabilities Act ("ADA").

8.      Title II of the ADA prohibits the unjustified segregation of persons with disabilities, *see* 42 U.S.C. § 12132; *Olmstead v. L.C.*, 527 U.S. 581, 597 (1999), and requires that state agencies, such as DCS, "administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d).

9.      Defendants have and continue to violate the federal rights of the Named Plaintiffs and Hoosier children in the affected Class and Subclass.

10.     DCS is capable of changing its practices; it is simply unwilling to do so. Juvenile courts cannot compel the systematic changes necessary to require compliance with federal law. A federal court, however, *can* require state child welfare agencies to cease unlawful and unconstitutional practices and implement necessary reforms. But if DCS remains unaccountable for its unlawful practices, it will continue to cause irreparable harm to thousands of foster children.

## JURISDICTION AND VENUE

11.     This action for injunctive relief pursuant to 42 U.S.C. § 1983 arises under the First, Ninth, and Fourteenth Amendments of the United States Constitution and the federal laws of the United States, including the Adoption Assistance and Child Welfare Act of 1980 ("AACWA"), 42 U.S.C. § 670 *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 701 *et seq.*, and their respective implementing regulations.

12.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. §§ 1331 and 1343(a).

4

13.     This Court has jurisdiction to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

14.     Venue in this District is proper under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to the claims herein occurred in this District, and Defendants maintain offices and conduct business in this District.

## PARTIES

### A. The Named Plaintiffs

### Annabel and Levi B.

15.     Annabel and Levi B. are siblings from Allen County. They were originally removed in February 2015 because their mother physically abused her two eldest children. Annabel and Levi appear in this action through their next friend, Brian Wilson. Brian is very familiar with Indiana's foster care system: he has fostered several children and adopted one child. Brian has acquainted himself with the allegations in the Complaint regarding Annabel and Levi's experience in foster care and is dedicated to their best interests.

16.     In 2017, DCS placed Annabel and Levi with their mother, and in 2018 placed the two older siblings with their mother. In May 2018, the CHINS case was closed with reunification.

17.     In September 2018, the children were again removed based on allegations of physical abuse and neglect by their mother. During interviews, the children disclosed to DCS that their mother had not fed them for several days as punishment.

18.     In June 2019, the children were adjudicated as CHINS a second time. After removal, DCS enrolled all of the children in different schools than the ones they attended prior to

removal. The children were placed in different homes with the exception of Annabel and Levi, who were placed together in the first two foster homes before being separated.

19.     As a direct result of Defendants' actions and inactions, Annabel and Levi have suffered and continue to suffer emotional and psychological harm. Specifically, if Defendants had secured timely and appropriate treatment, ensured that appropriate placements were available so that they could remain in a stable environment necessary for their recovery, made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of their cases, and not acted with deliberate indifference to their legal rights, Defendants may have prevented years of additional trauma that Annabel and Levi have suffered, and continue to suffer, while in DCS custody. Without relief, Annabel and Levi will remain at significant risk of harm from placement instability, lack of timely and appropriate services, and delayed permanency.

*Annabel B.*

20.     **Annabel** is a fourteen-year-old girl who has spent nearly half her life in foster care.

21.     In the two years following her removal in September 2018, DCS changed Annabel's placement 10 times.

22.     Prior to her removal, Annabel was sexually abused by her older brother. In 2019, while placed together in a foster home, Annabel touched her younger brother, Levi, inappropriately and encouraged him to watch pornography. There was also an unsubstantiated report of sexual abuse between Annabel and another foster child.

23.     In October 2018, one month and two placements after her removal, Annabel received a psychological evaluation in which she was diagnosed with adjustment disorder, anxiety,

and depression. The doctor recommended that Annabel receive weekly counseling from a therapist with experience treating child victims of physical abuse.

24.    In June 2019, eight months and two placements later, Annabel received a second psychological evaluation. Annabel's mental health had deteriorated significantly since the first evaluation, and her previous two placements disrupted because the foster parents could not handle her behavioral issues.

25.    Annabel purchased significant amounts of pornography on her foster parents' television, she was physically aggressive towards children at school, and she disrespected her teachers and other authority figures. Annabel also exhibited self-destructive and suicidal behaviors, including an incident where she cut her throat with a knife and was hospitalized.

26.    The doctor recommended that Annabel receive regular counseling from a therapist or therapists that specialize in child sexual behaviors and attachment disorder. The doctor warned that failing to properly treat these conditions would likely cause Annabel to develop a personality disorder as an adult.

27.    In April 2020, ten months and five placements later, Annabel received a psychological evaluation during her 30-day diagnostic stay at Damar Residential Services. Her condition continued to deteriorate.

28.    She was failing her classes at school, her motivation to learn was nearly nonexistent, and she was suspended from school several times for aggression and property destruction. Her moods were unpredictable, and she struggled to form and maintain friendships. Annabel was diagnosed with Post-Traumatic Stress Disorder and Disruptive Mood Dysregulation Disorder.

29.     After several unsuccessful medical interventions, the doctor concluded that the most important step towards Annabel's recovery was a stable living environment.

30.     After two months at Damar, DCS placed Annabel at Crossroad Children's Home, a Psychiatric Residential Treatment Facility. In March 2021, after ten months in Crossroad, Annabel was discharged to a kinship placement.

31.     In August 2021, DCS placed Annabel on a trial home visit with her mother. Annabel is still with the mother on a trial home visit.

32.     Annabel has received behavioral therapy and anger management therapy since 2018. She has received medical management services through Bowen Center. From March 2020 to March 2021, Damar and Crossroad took over Annabel's care.

33.     Since leaving residential treatment, Annabel began seeing a new therapist. But her therapist left the service provider, and the provider did not have a replacement therapist available. In February 2023, DCS placed a referral to another provider.

*Levi B.*

34.     **Levi** is a twelve-year-old boy who has spent over half of his life in foster care. In the two years following his removal in September 2018, DCS changed Levi's placement five times.

35.     In October 2018, one month and two placements after his removal, Levi received a psychological evaluation in which he was diagnosed with adjustment disorder, anxiety, and depression.

36.     In May 2019, seven months and two placements later, Levi received a second psychological evaluation. Like his sister, Levi's condition was also deteriorating. He exhibited

self-destructive and suicidal behavior. Levi was admitted to the emergency room and later received surgery for an infected finger resulting from Levi biting his fingernail.

37.    Levi missed his siblings and was terrified that he would be removed from his foster home and placed with his mother. He was suspended from school for kicking teachers and staff and for destroying school property. He did not trust his peers or adults, he struggled to form and maintain friendships, and he believed that people wanted to take advantage of him and harm him.

38.    Levi was diagnosed with serious depression and attention deficit disorder, and he was observed to be a victim of physical and sexual abuse. A doctor warned that a lack of comprehensive medication management and coordinated mental health treatment would cause Levi's conditions to worsen.

39.    Levi has been on a trial home visit with his mother since June 2021.

40.    In December 2021, DCS referred Levi for an assessment for sexual trauma. In November 2022, Levi received an assessment. Levi's mother did not follow recommendations.

41.    In February 2023, Levi's mother took Levi for an updated assessment. The doctor recommended individual and group therapy for adolescent sexual offenders. There is no indication that Levi is currently receiving treatment for his sexual trauma.

42.    Levi also stopped attending his regular counseling sessions on his mother's advice. Levi's IEP has been limited because school officials have been unable to contact the mother. Levi was absent from school for more than two weeks, and he received several suspensions for various behavioral problems, including watching pornography on school computers and being sexually inappropriate with other students.

43.    Levi now attends school on a modified schedule. He is failing nearly all of his classes.

44.     In March 2023, DCS received a report that the mother was physically abusing Levi.

**Kimberly F.**

45.     **Kimberly F.** is approximately 15 years old and has been in DCS custody for approximately eight years. Since 2015, DCS has bounced Kimberly between relative care and foster homes. Kimberly is a member of the ADA Subclass.

46.     Kimberly appears in this action through her next friend, Brian Wilson. Brian is very familiar with Indiana's foster care system: he has fostered several children and adopted one child. Brian has acquainted himself with the allegations in the Complaint regarding Kimberly's experience in foster care and is dedicated to her best interests.

47.     In 2015, DCS removed Kimberly and her sister after eight-year-old Kimberly was raped and molested by her stepfather. Kimberly's stepfather is currently incarcerated for those offenses.

48.     Kimberly's mother was also accused of neglect and illegal drug use.

49.     After being raped by her stepfather, Kimberly was sexually abused by her mother's boyfriend, further compounding her trauma.

50.     After removing Kimberly from her mother and stepfather in September 2015, DCS placed Kimberly with her grandmother, who is not a licensed foster parent. DCS knew that this placement was unsafe—DCS had denied the grandmother a foster license due to safety concerns. DCS also knew that the grandmother was selling pain medication to friends for money to buy gas and food. DCS knew that the grandmother was overmedicating and unable to properly supervise the girls. DCS had no record of a signed safety plan to mitigate safety concerns.

51.     Shortly after Kimberly's CASA (her second) was appointed to her case, Kimberly's caseworker was terminated. DCS did not inform the grandmother that the caseworker had been

terminated and did not explain the protocol she should follow until a new caseworker was assigned. The CASA made several unsuccessful attempts to inform the DCS supervisor that the maternal uncle residing in the home had been charged with sexual misconduct and posed a safety threat to the children; at the time of these attempted contacts, there was no caseworker assigned to Kimberly's case. Receiving no response, the CASA relayed her concerns to the Indiana Hotline.

52. While placed in the grandmother's home, Kimberly was sexually abused again, this time by the grandmother's neighbor. Despite recorded indications by DCS that the grandmother likely knew of Kimberly's ongoing abuse and was accepting food and other goods from the neighbor, DCS did not take steps to intervene to protect Kimberly.

53. Although DCS suspected that the neighbor was sexually abusing twelve-year-old Kimberly, they did not remove Kimberly or her sister from the home. Instead, they implemented a safety plan prohibiting contact between Kimberly and the neighbor. Soon thereafter, the grandmother sent Kimberly to dinner with the neighbor unsupervised, in violation of the safety plan.

54. On August 9, 2019, DCS removed Kimberly from the grandmother's home and placed her in a licensed foster home. DCS relayed its suspicions about the neighbor to the police. On September 4, police arrested the neighbor on charges of felony child molestation and child solicitation; the neighbor subsequently pled guilty and is currently incarcerated for these crimes.

55. In the six months following Kimberly's sexual abuse—from August 2019 to February 2020—Kimberly received no therapy or psychological evaluation. In February 2020, DCS connected Kimberly with a therapist, but, according to DCS records, DCS knew that more intensive therapy was required to address Kimberly's severe trauma.

56.     By April, Kimberly was seeing her new therapist virtually once per week. By June, this increased to twice per week, but this was also insufficient to address Kimberly's severe trauma. By July, Kimberly had another new therapist. With every new therapist, Kimberly was forced to retell her trauma to someone she had only just met, compounding her trauma with each retelling. No therapist remained long enough to establish Kimberly's trust.

57.     During this delay in treatment, Kimberly developed maladaptive coping mechanisms like disordered eating, which the DCS caseworker believed was how Kimberly coped with the untreated trauma. Kimberly also had frequent panic attacks. Kimberly's mental health continued to deteriorate, contributing to placement disruptions and eventually separation from her little sister, which further compounded her trauma.

58.     Meanwhile, DCS was facilitating supervised visitation between Kimberly and the grandmother even after Kimberly informed DCS that the grandmother, at the very least, knew about the ongoing sexual abuse, or, at worst, trafficked her for money and goods—even though DCS knew that returning to Kimberly to the place where she was sexually assaulted (and possibly trafficked) would trigger additional psychological harm.

59.     To mitigate concerns about sex trafficking, DCS determined that it was sufficient to merely provide sex offender awareness to the grandmother, teaching her how to navigate the sex offender webpage and to set boundaries between the girls and adult men.

60.     After being removed from the grandmother's home, DCS placed Kimberly and her sister in a temporary foster home and one week later removed the children for placement with a foster parent. When DCS asked the foster parent if she would accept placement of Kimberly and her sister, DCS told the foster parent that Kimberly was a CANS 2. In fact, Kimberly was a CANS

7. DCS did not inform the foster parent that Kimberly had serious behavioral issues or that Kimberly had threatened to light a house on fire at a previous placement.

61.    On January 2, 2020, the foster parent accepted placement of both Kimberly and her sister. The case manager provided the foster parent with a Ziploc bag containing various medications—including psychotropic drugs and sleeping pills—and advised the foster parent to follow dosage instructions listed on the bottles. Some bottles contained only enough doses to last two to three days.

62.    The case manager did not provide a medical passport; did not provide Kimberly's medical history, diagnoses or treatment; and did not provide any information about Kimberly's medical care providers. The case manager instructed the foster parent to take Kimberly to a pediatrician for medication management and monitoring.

63.    The pediatrician did not want to supervise the type and volume of medication that Kimberly was prescribed and recommended taking Kimberly to Riley Hospital. The physicians at Riley tapered Kimberly's medication and monitored her progress.

64.    Kimberly threatened suicide and was violent with other children in the home. On one occasion, Kimberly pushed the foster parent down the stairs. To protect the safety of her biological children and Kimberly's sister, the foster parent requested that DCS remove Kimberly. In March 2020, DCS removed Kimberly from the home. The foster parent put Kimberly's medication back in a Ziploc bag and returned it to DCS. DCS did not request any additional medical information from the foster parent—no subsequent diagnoses, treatment history, or medical providers.

65.    Because DCS could not find placement for Kimberly, they placed Kimberly back with her grandmother, who is still not a licensed foster parent.

13

66.     Throughout her time in care, Kimberly has cycled through dozens of therapists, counselors, caseworkers, schools, and institutions.

67.     Kimberly is currently placed with her grandmother, and DCS lists adoption with the grandmother as Kimberly's permanency goal.

68.     As a direct result of Defendants' actions and inactions, Kimberly has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had secured timely and appropriate treatment for her sexual abuse, implemented minimally safe safety plans, ensured that appropriate placements were available so that she could remain in a stable environment and establish a stable and trusting relationship with a therapist, made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Kimberly's case, and not acted with deliberate indifference to her legal rights, Defendants may have prevented years of additional trauma Kimberly has suffered, and continues to suffer, while in DCS custody. Without relief, Kimberly will remain at significant of harm due to placement instability, lack of timely and appropriate services, and delayed permanency.

### Miles M.

69.     **Miles M.** is an eight-year-old boy who has been in and out of DCS custody since 2017. Miles is currently in DCS custody and placed in a kinship placement. Miles is a member of the General Class.

70.     Miles appears in this action through his next friend, Jenna Hullet. Jenna is Miles' brother's aunt (related through a different biological father). Jenna had long-term placement of Miles' brother, who was killed by Miles' stepfather shortly after a trial home visit. Jenna has

14

acquainted herself with the allegations in the Complaint regarding Miles's experience in foster care and is dedicated to his best interests.

71.    Miles was initially removed from his home for abuse and briefly placed with his maternal grandmother before being moved to a foster home.

72.    While in the foster home, Miles attended supervised visits with his biological mother (approximately one hour away) and maternal grandparents (approximately two hours away). These visits caused Miles great anxiety: every time he visited his mother, he went into fits of vomiting; on multiple occasions, DCS returned Miles to his foster home early because the police had been called to his mother's home. He also often returned from the visits around 10:00 p.m. on school nights and exhibited signs of exhaustion at school. Due to threats from Miles' biological mother, the foster placement requested that Miles be removed from their care.

73.    DCS briefly transferred Miles to kinship placement with his maternal grandparents before recommending a trial home visit with his mother and stepfather. After a six-month trial home visit, DCS considered Miles reunified and closed his CHINS case.

74.    Six months later, in October 2021, Miles' stepfather murdered his younger brother, Justin. Miles' stepfather and mother are currently incarcerated for their role in Justin's death. The investigation into Justin's death revealed that Miles and his other siblings were in the home at the time of Justin's death. At the time, Miles was approximately six years old.

75.    After Justin's murder, DCS removed Miles and his younger brother, Daniel, from the home and separated the children. Both boys showed signs of having been abused.

76.    Upon information and belief, following Justin's death, Miles was shuttled to three different foster homes over six months. DCS then returned Miles to the foster parent he had been placed with prior to his reunification with his mother and stepfather.

15

77.     When DCS asked the foster parent to take placement of the boys, DCS did not provide any information about their behaviors. DCS described them as "typical" children. In fact, Miles' 11-month-old brother had extreme self-harming behaviors and could not be left unsupervised. Unable to meet his needs, the foster parent requested that DCS remove Daniel from her home. Miles remained in the foster parent's care for approximately one year.

78.     During this placement, Miles exhibited signs of having been abused and neglected: disordered eating, extreme fear of the dark, fear of any physical contact. Miles disclosed that he had been forced to sleep in a dog cage, that he had been abused by his stepfather, and that he had witnessed his stepfather abuse his brothers.

79.     Despite being in the home while his brother was murdered, and being abused himself, Miles only received two therapy sessions via Zoom during his one-year placement with the foster parent.

80.      Miles' foster parent requested additional mental health services for him. DCS did not provide the additional services. DCS knew, or should have known, that Miles had experienced severe trauma, that his condition was deteriorating, and that left untreated, his serious condition would cause irreparable harm to his safety and wellbeing. Despite this, DCS failed to provide timely and adequate treatment—until approximately seven months after the murder of his brother, when DCS finally secured some form of therapy for Miles.

81.     Shortly thereafter, DCS removed Miles from the foster home and placed him back with his maternal grandparents, where he remains currently, still without necessary services and treatment. Upon information and belief, Miles' grandparents are not licensed foster parents.

82.     As a direct result of Defendants' actions and inactions, Miles has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had conducted

regular fact-to-face visits during the trial home visit, secured timely and appropriate mental health treatment following the murder of his brother, ensured that appropriate placements were available so that he could remain in a stable environment and establish a stable and trusting relationship with a therapist, made reasonable professional judgments, engaged in reasonable case planning, not acted in disregard of professional standards as to the management of Miles' case, and not acted with deliberate indifference to his legal rights, Defendants may have prevented years of additional trauma Miles has suffered, and continues to suffer, while in DCS custody. Without relief, Miles will remain at significant risk of harm due to lack of timely and appropriate services and placement instability.

### Joshua J.

83.   **Joshua J.** is an approximately 16-year-old boy who loves sports. He has been in DCS custody for approximately nine years. During that time, DCS has bounced Joshua between 22 placements. Joshua is a member of the ADA Subclass.

84.   Joshua appears in this action through his next friend, Meghan Bartells. Meghan is the adoptive parent of Joshua's older sibling. Meghan maintains contact with Joshua through her adoptive child. Meghan has acquainted herself with the allegations in the Complaint regarding Joshua's experience in foster care and is dedicated to his best interests.

85.   In April 2014, Joshua and his siblings were home while their stepmother overdosed on the methamphetamine that Joshua's father was trafficking. For more than sixteen hours, Joshua's father attempted to revive their stepmother by dunking her in a cold bath and injecting her with heroine. When emergency services finally arrived, Joshua's stepmother was dead.

86.   One week later, Joshua's father was observed trafficking methamphetamine at a local McDonald's; according to court records, he had "a quarter pound of methamphetamine in the

car." That same day, DCS's Intake Unit received a report alleging Joshua and his siblings to be victims of neglect. The children were removed and placed in out-of-home care.

87.    Joshua's father is serving life sentences for murder and drug trafficking.

88.    The Initial Hearing was held on April 15, 2014. Eight months later, the second hearing was held, and the children were adjudicated CHINS. At the Dispositional Hearing held on February 3, 2015, the juvenile court issued a Dispositional Order approving DCS's recommendation of services.

89.    Four months later, the court approved DCS's recommendation of Termination of Parental Rights ("TPR") and Adoption. On February 1, 2016, DCS filed a TPR petition; one year later, the first TPR Hearing was held; and two months after that, the TPR was granted. From 2017 to 2022, review hearings were conducted every six months; no changes were made to the permanency plan. During that period, DCS changed Joshua's placement sixteen times, with no placement exceeding one year.

90.    DCS records indicate that Joshua did not receive consistent therapy for the seven years following his removal because DCS changed his placement with such high frequency.

91.    The murder of his stepmother profoundly traumatized Joshua and his siblings. DCS knew, or should have known, that Joshua had suffered severe trauma, that his condition was deteriorating, and that left untreated, his serious condition would cause irreparable harm to his safety and wellbeing.

92.    Joshua's trauma compounded every time he was forced to share his trauma with a new therapist, and, according to DCS records, Joshua's inconsistent treatment eroded his trust in medical and mental health professionals. During this time, Joshua expressed suicidal ideation and

exhibited serious behavioral issues. Joshua also had significant difficulty developing and maintaining relationships, including with foster placements and DCS caseworkers.

93.    His untreated trauma and resulting behavioral issues made it more difficult to find appropriate foster homes and increased the risk of placement disruption. This sequence of events produced a vicious cycle that persists to this day: placement instability causes more trauma which in turn causes more placement instability.

94.    In March 2022, DCS placed Joshua at Children's Bureau, Courage Center, a short-term residential facility, for an indefinite period because there were no appropriate foster homes available. According to DCS records, DCS knew that this placement could not meet Joshua's level of therapeutic need. DCS records also show that DCS knew that the type of therapy necessary to meet his needs would require Joshua to establish a working relationship with a therapist, which would require Joshua to be in a stable foster home placement. As the DCS caseworker noted in a progress report: "The current placement does not meet Joshua's current level of therapeutic need in that he is recommended to have Trauma Focused CBT. Unfortunately, this kind of therapy is more effective when Joshua would be able to establish a working relationship with the therapist and be in a place that would potentially be longer term."

95.    In the event DCS could not find an appropriate home placement, DCS planned to place Joshua in long-term residential treatment, which DCS knew was inappropriate for Joshua's placement needs.

96.    DCS was unable to find a foster home placement, and so DCS placed Joshua in Paddock View Residential Center, a residential treatment facility in Marion, Indiana. Upon information and belief, DCS has stated that Joshua is "unplaceable." He is currently listed for adoption on Indiana's Adoption Program website.

97.     As a direct result of Defendants' actions and inactions, Joshua has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had secured timely and appropriate mental health treatment after his stepmother's death, ensured that appropriate placements were available so that he could remain in a stable environment and establish a stable and trusting relationship with a therapist, made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Joshua's case, and not acted with deliberate indifference to his legal rights, Defendants may have prevented years of additional trauma Joshua has suffered, and continues to suffer, while in DCS custody. Without relief, Joshua remains at significant risk of harm due to placement instability, lack of timely and appropriate services, institutionalization, and delayed permanency.

**Nigel, Ashley, and Matthew M.**

98.     Nigel (12), Ashley (9), and Matthew (8) are siblings from Allen County who have been in DCS custody for more than 6.5 years. The siblings were initially removed in September 2016 for unsafe home conditions, including a leaking roof, no hot water or electricity, and animal feces and garbage throughout the home. The children were adjudicated CHIINS in October 2016. Following their initial removal, all four children were bounced between placements, with each sibling experiencing at least eight separate placements in their first three years of care. During this time, all siblings have demonstrated increasing behavioral and psychological issues. Nigel, Ashley, and Matthew are members of the general class and the ADA subclass.

99.     Nigel, Ashley, and Matthew appear in this action through their next friend, Kristy Long. Kristy is very familiar with Indiana's foster care system: she has fostered seventeen children and adopted two. After six years of fostering, Kristy stopped accepting placements and let her

license expire due to DCS's actions. Kristy has acquainted herself with the allegations in the Complaint regarding Nigel, Ashley, and Matthew's experience in foster care and is dedicated to their best interests.

100.    In August 2017, all four children were placed back with their parents on a trial home visit. Following repeated allegations of abuse and neglect by the mother and father, the children were removed in March 2018, approximately six months after being placed on the trial home visit. DCS reported that the children displayed sexualized behaviors during the trial home visit, an indication that the children may have been sexually abused.

101.    In July 2018, the two youngest siblings—Ashley and Matthew—were placed on a second trial home visit with their mother and her new boyfriend. Ashley and Matthew were removed from the home approximately three months later due to allegations of physical abuse, which were later substantiated. The mother's boyfriend, now husband, admitted to spanking Matthew too hard and leaving marks. All four children report being extremely scared of their mother's boyfriend.

102.    In June 2019, Nigel was accused of victimizing another child in his placement. DCS recommended they both participate in a psychosexual assessment.

103.    In a July 2019 progress report, DCS recommended TPR for all children because the family was unable to keep children safe without intervention and supervision of the court. The children's mother "has not shown that she is willing or able to protect her children from any further harm as she has stated that she trust (sic) [her boyfriend] to care for her children despite the new substantiation."

21

104.    By February 2022, the Court noted in a Permanency Plan Order that "these children have been languishing without permanency since 2016." That same month, the children's father voluntarily relinquished his parental rights.

105.    Upon information and belief, all four children have experienced declining mental health and increasing behavioral and psychological issues throughout their time in care.

106.    As a direct result of Defendants' actions and inactions, Nigel, Ashley, and Matthew have suffered and continue to suffer emotional and psychological harm. Specifically, if Defendants had secured timely and appropriate mental health treatment, ensured that appropriate placements were available so that they could remain in a stable environment and establish stable and trusting relationships with a therapist, made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of their cases, and not acted with deliberate indifference to their legal rights, Defendants may have prevented years of additional trauma that Nigel, Ashley, and Matthew have suffered, and continue to suffer, while in DCS custody. Without relief, Nigel, Ashley, and Matthew will remain at significant risk of harm due to placement instability, lack of timely and appropriate services, and delayed permanency.

*Nigel M.*

107.    **Nigel M.** is a twelve-year-old boy who has been in DCS custody for more than six-and-a half years. In the first three years alone, Nigel was shuttled to eight different placements.

108.    After removal in 2016, Nigel was placed in a foster home where he remained for approximately 11 months. He was then moved to a second foster home where he stayed for only one month.

109.    From there, he was placed on a trial home visit with his parents. Nigel and his siblings were removed from the trial home visit approximately six months later due to repeated allegations of abuse and neglect. When Nigel was removed from the trial home visit, he had bruising on his back, stomach, face, and genitals.

110.    After the failed trial home visit, Nigel was moved to his fourth placement where he remained for approximately seven months before being moved to his fifth placement. Nigel remained in his fifth foster home for approximately eight months. DCS then moved him to his sixth and seventh placements, where he remained for one and eight days respectively. In June 2019, Nigel was moved to his eighth placement.

111.    In February 2019, two and a half years after entering care, Nigel participated in neuro-psychological testing and was diagnosed with Post Traumatic Stress Disorder ("PTSD"), a mild intellectual disability, parent-child relational problems, and child neglect. The assessment ruled out a diagnosis of Attention Deficit Hyperactivity Disorder ("ADHD").

112.    It was recommended that Nigel receive individual therapy and home-based case work services. It was also recommended that Nigel receive follow-up psychological assessments every three years.

113.    Nigel had an established Individualized Educational Plan ("IEP") and had adjusted school days to meet his needs.

114.    Due to suspected sexual abuse, DCS recommended that Nigel participate in a psychosexual assessment.

115.    However, an October 2020 Status Report listed Nigel's diagnoses as including ADHD, Impulse Control Disorder, Anxiety Disorder, and victim of sexual abuse.

116.    By March 2022, several service providers had expressed concern about Nigel acting out and getting into trouble at school. Additionally, Nigel had verbalized that he wanted to kill himself and others.

*Ashley M.*

117.    **Ashley M.** is a nine-year-old girl who has been in DCS custody for more than six-and-a-half years. In the first three years alone, Ashley was also moved to nine different placements.

118.    After removal in 2016, Ashley was placed in a foster home where she remained for approximately one year. Ashley was then placed on a trial home visit with her parents and siblings. Ashley and her siblings were removed from the trial home visit approximately six months later due to repeated allegations of abuse and neglect.

119.    After the failed trial home visit, Ashley was moved to her third placement where she remained for approximately two months before being moved to her fourth placement.

120.    Approximately one month in her fourth placement, Ashley and her brother Matthew were placed on a second trial home visit, this time with their mother and her new boyfriend. The second trial home visit also failed. Ashley and Matthew were removed approximately three months later following allegations of physical abuse by their mother's boyfriend. The allegations were later substantiated.

121.    Ashley was then moved to her sixth placement, which lasted five days. Her seventh and eighth placements lasted two and three weeks respectively. In December 2018, only two years after entering care, Ashley was moved to her ninth foster placement.

122.    In a February 2018 assessment, Ashley was diagnosed with Other Specified Disruptive, Impulse-Control, and Conduct Disorder. It was recommended that further assessment

24

be done to rule out PTSD, Persistent Avoidance of Stimuli, and Negative Alterations in Cognitions. Ashley was also referred for an updated mental health assessment with Park Center.

123.    An October 2020 Status Report to the court listed Ashley's diagnoses as Generalized Anxiety Disorder, Adjustment Disorder with Anxiety, PTSD, and ADHD.

124.    Upon information and belief, Ashley is currently in a foster home that is willing to have her stay, but the home is not pre-adoptive. DCS requested an emergency detention hearing claiming that the foster parents do not want her there any longer, despite foster parents' testimony to the contrary.

*Matthew M.*

125.    **Matthew M.** is an eight-year-old boy who has been in DCS custody for more than six-and-a-half years. Matthew was first removed from his parents' home when he was two years old. By the time he was four years old, Matthew had been moved eleven times.

126.    After removal in 2016, Matthew was placed in a foster home where he remained for approximately one year.

127.    Matthew was then placed on a trial home visit with his parents and siblings. Matthew and his siblings were removed from the trial home visit approximately six months later due to repeated allegations of abuse and neglect.

128.    After the failed trial home visit, Matthew was moved to his third placement where he remained for approximately two months before being moved to his fourth placement, which lasted five days. Matthew was then moved to his fifth placement.

129.    Matthew was then moved, with his sister Ashley, to a second trial home visit. This time they were placed with their mother and her new boyfriend. The second trial home visit also failed. Mathew and Ashley were removed approximately three months later following allegations

of physical abuse by their mother's boyfriend. The mother's boyfriend, now husband, admitted to spanking Matthew too hard and leaving marks. The allegations of physical abuse were substantiated.

130. Following the second failed trial home visit, Matthew was placed in his seventh foster placement for seven days. His eighth placement lasted approximately two weeks. Matthew's ninth and tenth placements lasted three and four months respectively. By June 2019, Matthew was placed into his eleventh foster placement in less than three years.

131. In February 2018, one and a half years after his initial removal, Matthew was assessed through Park Center's 3 Wishes Program. He was diagnosed with Other Specified Disruptive, Impulse-Control, and Conduct Disorder. It was recommended that further assessment be done to rule out PTSD, ADD, learning disorders, and autism.

132. In July 2019, Matthew was participating in individual therapy through the Villages and had been referred for an updated mental health assessment through Park Center.

133. An October 2020 Status Report to the court listed Matthew's diagnoses as ADHD, PTSD, Specific Learning Disorder with moderate impairment in reading, Other Specified Disruptive, Impulse-Control and Conduct Disorder, and Autism Spectrum Disorder requiring substantial social communication support.

134. The assessment added, "It is imperative that the patient's daily life include as much structure, consistency, and routine as possible… He needs developmentally appropriate trauma therapy based on his adaptive limitations." At that point in time, Matthew had experienced nearly constant change, being bounced between at least eleven different placements in four years.

**Sophia P.**

135.    **Sophia P.** is a thirteen-year-old girl from Tippecanoe County who has been in DCS custody since 2019. Since then, Sophia has been bounced between eight foster homes, two residential placements, multiple emergency room stays and acute stays, and five caseworkers.

136.    Sophia appears in this action through her next friend, Alicia Pratt. Alicia is Sophia's public defender and maintains regular contact with Sophia. Alicia has acquainted herself with the allegations in the Complaint regarding Sophia's experience in foster care and is dedicated to her best interests.

137.    DCS records indicate that Sophia was the subject of a prior in-home CHINS case, which was closed with reunification in December 2013.

138.    In October 2018, Sophia disclosed to her legal father that she was sexually abused by her mother's fiancé, R.T. Sophia's father filed a police report. Sophia and her sister were forensically interviewed and both disclosed sexual abuse by R.T. DCS did not remove the girls. Instead, DCS implemented a safety plan prohibiting any contact between the girls and R.T.

139.    In May 2019, DCS again received reports that R.T was living in the home with the girls and that Sophia was sexually abused. Sophia again disclosed to the DCS caseworker that she had been sexually abused by R.T. The mother denied the allegations and refused to move R.T. out of the house.

140.    Sophia's younger sister was taken to the hospital with a contusion to her forehead and a second degree burn across her face. DCS removed the girls from the home and filed a CHINS petition on June 4, 2019. According to the petition, Sophia was removed for neglect, endangering the physical or mental health of the child, and being the victim of a sex offense.

141.    DCS knew that Sophia had undergone severe trauma, and that left untreated, her serious condition would cause irreparable harm to her safety and wellbeing. Moreover, DCS knew or should have known that without adequate treatment, a victim of sexual abuse is likely to repeat the abuse on others, increasing their risk of institutionalization or incarceration. Despite this, Sophia did not receive any trauma therapy for almost two years. But by then, the therapy was insufficient to address Sophia's complex trauma.

142.    In August 2021, Sophia's foster parents alleged that Sophia sexually abused a younger foster child in the home. Sophia's foster mother took her to the emergency room that evening, and the physicians determined that no there was no need for further residential or acute placement. Sophia was then placed in a temporary foster home while DCS attempted to locate placement.

143.    Sophia was appointed a public defender, next friend Alicia, in light of potential delinquency charges.

144.    DCS terminated parental rights for all of Sophia's three siblings; DCS did not do so for Sophia. Instead, DCS commenced a "file-and-dismiss"—they filed a TPR petition at 10:23 am on September 10, 2020, and then at 11:02 am filed a motion to dismiss that petition. DCS filed the petition with the express intent of dismissing the petition. DCS filed a second TPR petition on March 7, 2022; and moved to dismiss the petition on September 9, 2022, stating "[w]hile DCS believes that all children are adoptable…DCS concedes that there is no set placement located for Sophia upon her release from Gibault, and that placement will be difficult to locate."

145.    In June 2022, Sophia was placed at Gibault Children's Services, a residential treatment center in Terre Haute, Indiana, approximately 3.5 hours from her home. Gibault was unable to provide the specialized treatment recommended for treating Sophia's complex trauma,

and DCS has been unable to secure that form of treatment outside of Gibault "due to limited supply of trust-based relational intervention (TBRI) providers." Sophia was waitlisted for transfer to another residential treatment facility.

146.    She did not transfer to another facility. Instead, in August 2023, more than a year after she was placed in Gibault, Sophia was placed on a trial home visit with her legal father. She will continue to attend therapy and have a complete a new psychosexual assessment.

147.    As a direct result of Defendants' actions and inactions, Sophia has suffered and continues to suffer emotional and psychological harm. Specifically, if Defendants had secured timely and appropriate treatment following her sexual abuse or aggression, ensured that appropriate placements were available so that she could remain in a stable environment necessary for her recovery, made reasonable professional judgments, engaged in reasonable case planning and placement matching, not acted in disregard of professional standards as to the management of Sophia's case, and not acted with deliberate indifference to her legal rights, Defendants may have prevented years of additional trauma Sophia has suffered, and continues to suffer, while in DCS custody. Without relief, Sophia will remain at significant risk of harm due to placement instability, lack of timely and appropriate services, institutionalization, and delayed permanency.

**B. Defendants**

### Eric Holcomb, Governor of Indiana

148.    Eric Holcomb, Governor of Indiana, is sued in his official capacity. Governor Holcomb is responsible for executing Indiana's law and ensuring executive departments, including DCS, comply with applicable laws. Indiana Constitution, art. 5, § 1, 16. Governor Holcomb has the power to issue executive orders and to shape the functions and coordination of DCS; and he is

charged with appointing the Director of DCS, who serves "at the pleasure of the Governor" and reports "directly to the Governor." IN Exec. Order No. 05-15 (Jan. 11, 2005); IND. CODE § 31-25-1(b) (2023). The Governor has used his executive authorities to manage the work of DCS and the child welfare system in Indiana.

### Eric Miller, Director of DCS

149.    Eric Miller, Director of DCS, is sued in his official capacity. Director Miller is "responsible for administering" DCS. IND. CODE § 31-25-1(b) (2023). Those responsibilities include, but are not limited to, employing personnel to carry out DCS's responsibilities; contracting with service providers to ensure children and families receive necessary services; recruiting foster parents and maintaining enough foster homes to ensure that children have suitable placements; protecting and supervising children in state custody and providing for their basic human needs; organizing DCS in a manner best suited for providing its necessary services; and carrying out its functions throughout the state.

### Indiana DCS

150.    DCS is the executive agency responsible for the safety and well-being of children in Indiana. DCS has a central office in Indianapolis and 18 regional offices that cover Indiana's 92 counties. Under Indiana law, DCS's responsibilities include, but are not limited to, providing child protection services; providing child abuse and neglect prevention services; providing family preservation services; regulating, licensing, and monitoring foster family homes, licensed child placing agencies, child caring institutions, group homes, and private secure facilities; administering foster care services; and conducting adoption and guardianship services.

151.    DCS has created child welfare policies and practice standards in order to carry out its responsibilities and comply with legal requirements under state and federal law. The Director

30

of DCS employs personnel to carry out DCS's mandate, including but not limited to family case managers ("FCMs"), who are responsible for investigating allegations of abuse and neglect as well as planning for children in foster care. The Director is also responsible for monitoring and supervising the services associated with ongoing child in need of services ("CHINS") cases. DCS also contracts with numerous service providers throughout Indiana to deliver services related to the prevention of abuse and neglect, preservation of families, placement of children, and permanency goals for children who enter foster care.

## FACTUAL ALLEGATIONS

152.    The data reveals a foster care system in crisis: foster children in Indiana remain in state custody for too long, move through far more placements than the national standard, re-enter the foster care system at higher rates, are returned home when their homes are unsafe, and experience maltreatment in care at rates that exceed national standards.

153.    DCS's actions, inactions, practices, and policies leave children without stable, permanent homes and threaten their safety and wellbeing.

**I.    The role of DCS in child welfare.**

154.    When DCS files a CHINS petition or removes a child from the home, an initial hearing must be held shortly thereafter to determine whether continued placement with the parents is in the best interests of the child. *See* IND. CODE § 31-34-10-2(a); §§ 31-34-5-1(a), 31-34-10-2(j) (2023). If parents contest the allegations, a factfinding hearing must be held to determine whether the child is a CHINS. If the court determines a child to be a CHINS, it must schedule a dispositional hearing and must order DCS to prepare a report recommending placements and services. *See* IND. CODE § 31-34-11-1; §§ 31-34-11-2, 31-34-18-4, 31-34-19-1 (2023).

155.    At the disposition hearing, if the court disagrees with DCS's recommendations, the hearing is continued and DCS submits a supplemental report with its final recommendations at the next hearing. *See* IND. CODE § 31-34-19-6.1(c) (2023). Indiana law creates a presumption of correctness for these recommendations. The court must accept DCS's final recommendations unless they are "unreasonable, based on the facts and circumstances of the case," or "contrary to the welfare and best interests of the child." *See* IND. CODE § 31-34-19-6.1(d) (2023).

156.    When issuing orders in CHINS proceedings, juvenile courts complete a form, checking the appropriate boxes and filling in the blanks.

157.    Indiana law makes clear that courts serve a ministerial function in the administration of the children welfare system. DCS is the driving force behind all decisions in a CHINS case.

158.    A final judgement must be appealed within 30 days of the final judgement. *See* Ind. Appellate Rule 9(A)(1). A finding of CHINS status is not final judgement; nor is a permanency plan; nor a factfinding order. The dispositional order is the only final appealable judgement in CHINS proceedings. Modifications to a dispositional order are considered new dispositional orders and are therefore final appealable judgements. So, for example, in a CHINS proceeding spanning 5 years in which the court has issued one dispositional order and two modifications, there are a total of 90 days in which a party could have appealed (the 30 days following each disposition order or modification). And since CHINS are not entitled to an attorney, it is extremely unlikely that a CHINS will ever have adequate opportunity to perfect an appeal. Even if a CHINS had adequate opportunity to develop facts proving systemic problems, the appellate court would review the juvenile court's application of facts to the law for clear error (in the light most favorable to the judgement).

32

159.    There are three categories of juvenile proceedings in Indiana: children in need of services (CHINS) proceedings for child victims of abuse and neglect; juvenile delinquency proceedings for children who committed a crime listed in the Indiana criminal code (Dual Status); and criminal proceedings for children between ages 16-18 who committed a felony (Criminal Status). For criminal cases, a prosecutor charges the child between ages 16 and 18 with a felony (IC § 31-30-1-4), the criminal court retains jurisdiction (IC § 31-30-1-4(b)), "the laws governing criminal trials apply" (IC § 31-32-1-2), the child has a right to an attorney, and the purpose of the proceeding is punishment. Juvenile delinquency proceedings are quasi-criminal civil enforcement actions: a prosecutor files a petition of delinquency alleging that the child "commit[ed] an act that would be an offense if committed by an adult" (IC § 31-37-1-2), "the procedures governing criminal trials apply" (IC § 31-32-1-1), the child has a right to counsel (IC § 31-32-4-2; Criminal Rule 25), and the purpose of the proceeding is rehabilitation (IC § 31-32-2-6). For CHINS proceedings, a DCS attorney files a CHINS petition alleging that a child is in need of services (IC § 31-34-9-1), the proceedings are governed by the Indiana Rules of Civil Procedure (IC § 31-32-1-3), the child is not entitled to an attorney (IC § 31-32-4-1), and the purpose of the proceeding is "to protect and obtain permanency for the child." Indiana CHINS and Family Law Deskbook 4-54 (2017).

## II.    DCS actions, inactions, practices, and policies threaten the safety and well-being of Indiana's foster children.

### A.    DCS fails to recruit and retain an adequate number of caseworkers.

160.    A sufficient, qualified, and trained workforce with manageable caseloads is foundational to a well-functioning child welfare system. Caseworkers must have the necessary skills, resources, time, and supports to engage families and providers in creating meaningful plans

and monitoring progress towards individualized case goals, among many other important tasks. Child welfare systems must ensure that the appropriate number and types of positions—including case managers, supervisors, and support staff—are allocated within each region and county office so that caseloads are manageable. They must also ensure that when vacancies exist, they are quickly filled by qualified staff with as little disruption as possible to families and other staff. Caseworkers need adequate training and supervision to ensure they have the knowledge and skills required to effectively carry out their roles. Caseworkers must be compensated with salaries and benefits that equate to a professional living wage so they can invest in and pursue their work as a career.

161.    Caseworkers cannot adequately perform their jobs when an agency has too many cases and not enough caseworkers. This creates a cascade of critical failures, all of which jeopardize the health and safety of children in foster care. Overburdened caseworkers cannot:

    a.   timely and adequately investigate claims of abuse and neglect;

    b.   inspect placements for safety on an ongoing basis;

    c.   conduct regular and meaningful visits with children;

    d.   work with parents to ensure they receive necessary services so they can resume custody of their children;

    e.   determine whether parents can safely resume custody of their children;

    f.   facilitate regular and meaningful visitation between family members;

    g.   timely respond to foster parents and children;

    h.   build and maintain trust with children and families;

    i.   make thoughtful, informed, unbiased decisions;

     j.   screen children for medical needs or arrange the provision of timely and appropriate medical treatment;

     k.   ensure continuity of medical care;

     l.   timely develop adequate permanency plans and secure services necessary to achieve permanency goals; and

     m.  develop professional skills.

162.    And an understaffed agency cannot:

     a.   recruit, retain, and train new caseworkers;

     b.   recruit, retain, and train a varied and adequate number of foster parents that can address the wide range of children's needs; and

     c.   maintain an adequate array of service providers and provide necessary services to children, biological parents, and foster parents.

163.    These burdens weigh heavily on caseworkers, cause significant psychological stress, and ultimately result in high burnout and turnover. When caseworkers quit, it compounds all these problems, creating a vicious cycle that causes more turnover, increases risk of harm to children, and expends scarce resources. For example, one study found that foster children with one caseworker in a given year had an approximately 75% chance of achieving permanency, those with two caseworkers had an approximately 18% chance of permanency, and those with more than three caseworkers had only a 2% chance of permanency.

164.    Staff turnover wastes precious financial resources; every staff turnover costs between 45% and 115% of an employee's annual salary given the expenses of recruiting, training and onboarding new staff. These systemic problems have direct, tangible impacts on individual cases.

165.   For these reasons, it is critical that caseworkers have manageable caseloads. The Child Welfare League of America ("CWLA"), a national coalition of agencies that develops child welfare policies, recommends that caseloads be between 12 and 15 children per worker for children in foster care. The Council on Accreditation ("COA"), a national professional accrediting organization, recommends that caseloads be 12 to 15 children per worker and only eight children where the child is in treatment foster care.

166.   For years, DCS has failed to recruit and retain a sufficient number of caseworkers. In 2021, the agency lost 1,018 FCMs and trainees and gained only 628—a net loss of 390. In 2022, DCS lost 941 FCMs and gained only 602—a net loss of 339, compounding the previous year's losses.

167.   As a result of DCS's failure to recruit and retain a sufficient number of caseworkers, DCS fails to maintain professionally accepted caseload standards, even as the number of cases handled by DCS has declined. DCS caseworkers report having caseloads as high as 35 individual cases for years at a time. A CHINS attorney reported not bothering to learn caseworker's names because they rarely saw the same caseworker more than once. Upon information and belief, some counties are so short-staffed that DCS assigns cases to caseworkers in neighboring counties.

168.   Crushing caseloads place significant stress on DCS caseworkers. Many caseworkers experience burnout and quit. Others remain at DCS but are so overburdened they are unable to perform the most basic case management functions and are forced to make impossible decisions that jeopardize the safety of the children on their caseload. The Office of the Indiana Inspector General has found numerous instances of caseworkers falsifying Management Gateway for Indiana's Kids ("MaGIK") entries and court filings. In one investigative report, a DCS caseworker "admitted to making false entries regarding face-to-face visits with the children and

caregivers in question"; "stated that prior to DCS terminating her employment, she maintained a caseload of forty-nine assessments or reports assigned to her"; and "stated she falsified the entries to 'buy time,' but she knew it was wrong."

169.    As a result of its ongoing caseworker retention problem, DCS is unable to adequately implement safety plans, to inspect placements, to conduct visits with children, or to make important decisions about a child's life such as whether to recommend that a child should be returned home. Upon information and belief, caseworkers routinely fail to conduct appropriate face-to-face private visitation with children on trial home visits ("THVs") prior to closing cases. DCS's inability to supervise children on THVs exposes children to a serious risk of harm and death, and it increases the risk of re-abuse and reentry into foster care, perpetuating trauma and instability.

170.    Upon information and belief, one method DCS has employed to reduce caseload burdens is the implementation of an internal policy directing caseworkers to refer 50% of their cases to the Safe Assessment Closure Team (SafeACT) for expedited closure. Created in 2021, the SafeACT was "developed to remove barriers for timely closure for specific assessments of Child Abuse and/or Neglect." Upon determination that all children involved in an assessment are safe, caseworkers may refer those cases to SafeACT, who then "assist with documentation to close the assessment immediately." But instead of fast-tracking low-priority cases as intended, DCS is using SafeACT to quickly reduce caseload numbers despite serious safety concerns. DCS's SafeACT 50% policy places children at significant risk of harm.

171.    DCS does not follow generally accepted caseload standards for its caseworkers, relying on questionable and misleading methodologies to calculate caseloads instead of simply counting the number of children's cases on a worker's caseload. Indiana uses a case weighting

methodology that gives "residential placement…50% of the value of a traditional child in need of services [CHINS] case," based on its reasoning that "most case-management functions are assumed by the residential facility." Based on information and belief, these children and their families often require more attention, not less, and DCS does not monitor these facilities to ensure that these "case management functions" are indeed adequately managed by residential facilities. DCS is aware that the methodology it uses to calculate caseloads does not accurately reflect caseworker workload. In 2015, DCS paid consulting firm Deloitte over $500,000 to study workloads and recommend solutions. DCS did not adopt the many case counting methodologies recommended in the report, choosing instead to employ a methodology that undercounts workloads.

172.    Despite these policies and practices—fast-tracking cases through SafeACT, underweighting cases with questionable methodologies, assigning cases from short-staffed counties to caseworkers in neighboring counties—DCS is still unable to maintain professionally accepted caseload standards.

173.    Director Miller is aware of the harms caused by an inadequate workforce and unmanageable caseloads. The 2022 Staffing and Caseload Report admitted that "[s]ome barriers to recruitment and retention are endemic to the work done by family case managers." DCS has not pursued reasonable steps to overcome barriers to recruitment and retention based on a belief that that such barriers cannot be overcome.

**B.  DCS's termination of parental rights practices leave children in limbo and delay permanency.**

174.    As a result of its ongoing caseworker retention and placement capacity problems, DCS is unable to secure permanency for foster children. Indeed, Indiana's foster children are

languishing in DCS custody at rates in excess of national standards. Since 2017, the average time in foster care has increased by more than 100 days (from 490 days to 596 days).

175.    From 2015 to 2020, Indiana saw a 45% increase in the median time to permanency. In 2021, the number of days to reunification (436 days) was 19.5% higher than the national standard (365 days), and the number of days to adoption in Indiana (1,112 days) was 52.3% higher than the national standard (730 days).

176.    To ensure that children in foster care achieve permanency in a timely manner, federal law requires states to file or join a petition to terminate parental rights ("TPR") if a child has been in foster care for 15 months out of the previous 22 months ("15/22 requirement"), unless the child qualifies for a statutory exception. 42 U.S.C. § 675(5)(E). Congress' intent was to prevent children from languishing in foster care by requiring states to either reunify or find another permanent home for children through adoption or placement with a qualified relative within a reasonable time period. However, Indiana has interpreted federal law so that it only needs to file a TPR petition once to satisfy the requirement of that federal law, even if it dismisses the petition shortly thereafter and retains custody of children indefinitely.

177.    In Indiana, DCS maintains a system-wide practice of filing and immediately dismissing a TPR petition, commonly referred to as a "file-and-dismiss." Although this file-and-dismiss practice may satisfy the letter of the law and allow DCS to check a box, it clearly violates the spirit of the law. Upon information and belief, DCS workers are required to use one of two forms when filing a TPR petition: a file-and-dismiss or a file to proceed. In many cases, the TPR petition and dismissal are filed simultaneously, often as part of the same document. Further, parties are often unaware of when DCS files and dismisses the petition because the TPR petitions are not

linked to the child's CHINS case under Indiana's new case management system (Odyssey Case Management System).

178.    As a result of this practice, children often remain in foster care for years, caught in limbo between reunification and adoption or permanent placement with relatives.

**C. DCS trial home visit practices expose foster children to a serious risk of harm.**

179.    According to DCS policy, a trial home visit ("THV") is intended to last for a period of up to three months and may be extended in three-month increments, "when the safety and well-being of the child can be reasonably ensured" and the child's permanency goal is reunification. Any safety concerns must have been addressed, there must be progress towards the case goals, and the service level of the case must be decreased. DCS Child Welfare Policy, Ch. 8, § 39.

180.    DCS retains all placement and care responsibilities for children who are on trial home visits and the FCM must provide continued services to the family, including making weekly face-to-face contact with the children and parent(s). *See* DCS Child Welfare Policy, Ch. 8, § 39; Ch. 8, § 10.

181.    Upon information and belief, DCS routinely places children on trial home visits that it knows, or should reasonably know, are unsafe. Because DCS caseworkers have unmanageable caseloads, weekly face-to-face contact with children and parents during trial home visits often does not occur. When caseworker are not seeing children with the required frequency, it is impossible to know whether the child's safety can be reasonably ensured.

182.    Indiana's foster home shortage compounds the pressure on caseworkers to utilize trial home visits, particularly for foster children who may be harder to place.

183.    Further, upon information and belief, necessary services that were in place for children in their out-of-home placements often cease when they are placed on a trial home visit.

40

184.    DCS then either closes the CHINS case and considers the child reunified, or the trial home visit fails and the child is subjected to further placement disruptions.

185.    When children are reunified before DCS has verified that the child's safety and well-being can be reasonably ensured, reunification leads to reentry into foster care and additional trauma to children. In 2020, 20% of children who were discharged from foster care in Indiana reentered care within two years.

### D.  DCS fails to maintain and update medical records for foster children and fails to provide full and accurate medical information to foster and adoptive parents.

186.    Thorough and accurate recordkeeping is critical to every child welfare system. If an agency does not adequately manage medical records for children in its care, it cannot provide timely and appropriate medical treatment. Without an adequate recordkeeping system, an agency is incapable of even *knowing* whether children have been provided timely and appropriate treatment. This bedrock principle is codified in federal and state law and is considered the bare minimum of professional standards by national health and child welfare organizations.

187.    Title IV-E of the Social Security Act requires child welfare agencies to maintain up-to-date medical records as part of a written case plan for each child in care. The case plan must contain updated health care records, including "the child's known medical problems" and "the child's medications." Child welfare agencies must also have a procedure for ensuring that a copy of this record is supplied to the foster parent or placement provider "at the time of each placement." 42 U.S.C. §§ 671(a)(16), 675(1)(C)(v)-(vii), 675(5)(D).

188.    The American Academy of Pediatrics ("AAP") warns that high placement frequency and high foster care reentry rates "are usually accompanied by changes in health care providers," and "[a]s a result, available health information about these children is often incomplete

41

and spread across many different sites." Accordingly, the AAP recommends agencies develop an "abbreviated health record, often called a medical passport" in order to "enhance continuity of care."

189.   The Child Welfare League of America ("CWLA") standards require the public child welfare agency to develop "an abbreviated health record, such as a medical passport, that accompanies the child throughout the child's stay in out-of-home care," containing, at minimum, "[t]he child's health history prior to placement . . . [and] immediately before entering care." The agency should update this record "in a timely manner, entering information about the child's health status, services, and needs as soon as information becomes available."

190.   The American Academy of Child and Adolescent Psychiatry ("AACAP") recommends maintenance of "an ongoing record of diagnoses, height and weight, allergies, medical history, ongoing medical problem list, psychotropic medications, and adverse medication reactions that are easily available to treating clinicians 24 hours a day." Having these records available for review allows caseworkers and physicians "to assess past successful and unsuccessful treatments . . . reduc[ing] the chance that previously ineffective treatments will be used again."

191.   Notwithstanding these laws, policies, and professional standards, DCS fails to maintain an adequate medical recordkeeping system for children in its custody. Upon information and belief, DCS systematically fails to maintain and update medical records, fails to provide medical information to foster parents, and fails to collect medical information from foster parents upon removal. Instead, children habitually arrive at new foster homes with just an unmarked sandwich bag containing their medications. DCS rarely provides foster parents with a medical passport; when they do, it is typically blank or includes incomplete or incorrect information. When asked, many foster parents have never heard of, let alone seen, a medical passport.

192.    DCS's systematic failure to maintain and update medical records is corroborated by a recent audit conducted by the U.S. Department of Health and Human Services Office of Inspector General ("OIG Report"). The OIG Report, entitled "Indiana Did Not Comply With Requirements for Documenting Psychotropic and Opioid Medications Prescribed for Children in Foster Care," found that 95% of the random sample of health care records for children who were prescribed psychotropic or opioid medications did not contain medical passports; 58% did not include authorizations for prescribed psychotropic medications; 62% of the records of the children who were residing in residential facilities and prescribed psychotropic medication did not contain the required written reports and medical reviews from the children's prescribing health care providers; and 66% of psychotropic or opioid medications prescribed to children were not recorded in the Management Gateway for Indiana's Kids (MaGIK) system.

193.    DCS's failure to maintain and update medical records and its failure to provide medical information to, and collect information from, foster parents significantly disrupts the care continuum. The OIG Report found that DCS "did not have adequate controls to ensure the FCMs maintained the children's health care records in accordance with State requirements." For example, although DCS "reviews one randomly selected case each quarter and provides supervisor oversight of each FCM at least monthly," the OIG concluded that DCS's oversight of FCMs "did not adequately address the maintenance of health care records" because the "case review survey form contained only a single question related to medical records." Additionally, although DCS "has an established 12-week training program for new FCMs and a mandatory 24-hour annual training requirement for established FCMs," the OIG concluded that "the FCMs were provided insufficient training for documenting health care information in MaGIK" because "the training curriculum does not address all the requirements for documenting health care information in MaGIK."

43

194.    The OIG Report highlights the importance of maintaining electronic copies of medical records—it "enables the FCMs to review the children's health care information at any time" and "serve[s] as a backup in case the original medical passports are lost"—and emphasizes the risk of failing to do so—"[w]ithout access to up-to-date health care records, the State agency could not always ensure that the FCMs provided adequate oversight and the children received the necessary health care services."

195.    In a letter responding to the OIG report, the DCS Director admitted that DCS's medical recordkeeping system is inadequate, stating that "the agency acknowledges its record-keeping processes require updating," and acknowledging that a robust monitoring system, "is critical to ensuring the safety and well-being of children in care."

196.    The DCS Director explains that DCS has, since 2020, been developing a new recordkeeping system called I-KIDS intended to "bolster the agency's efforts to implement controls and procedures for inputting medication information, as well as maintain health care records and medication authorizations." There is no projected completion date.

197.    Even if DCS maintained an adequate recordkeeping system, the records are of no utility if they are not provided to the individuals charged with caring for those children. DCS systematically fails to provide full and accurate medical information to foster parents. DCS withholds necessary medical information to encourage foster parents to accept placements that they might not otherwise accept if they knew the reality of the child's medical situation. Whatever the reason, DCS's policy or practice of withholding necessary medical information from foster parents places children at risk.

198.    For example, DCS will represent to a foster parent that a child has a CANS score of 2 when, in fact, the child has a CANS score of 7; DCS will represent to the foster parent that a

child has no serious mental health conditions when, in fact, the child exhibits extreme self-harming behaviors; DCS will represent to the foster parent that a child has not been a victim of sexual abuse when, in fact, a child was removed from the home based on allegations of sexual abuse.

199.    Without the necessary medical information, foster parents are unable to provide adequate care and support for the child—they are unable to administer the appropriate types and dosages of medications; unable to maintain regular treatment with medical providers; unable to seek appropriate diagnoses and treatment from medical providers; unable to prepare the home to accommodate special needs; unable to maintain individualized education plans; and unable to maintain continuity of care. This threatens the health and safety of the child, the foster parents, and other children in the home. It may often result in a placement disruption, which causes additional trauma to the child and makes future foster home placements more difficult. It also makes foster parents wary of relying on DCS's description of children and discourages foster parents from accepting future placements.

200.    DCS similarly withholds medical information from adoptive parents. Without the necessary medical information, adoptive parents are unprepared to care for the child's needs, the child's health and safety is compromised, the adoption is broken, the child sustains additional trauma, and permanency becomes even more distant and difficult.

**E. DCS's treatment of foster parents reduces placement capacity.**

201.    Child welfare policy requires that children in foster care reside in family-like environments, in or close to their home communities, and with siblings whenever possible. Stable and appropriate placement for children in foster care is essential for child safety and well-being, and maintenance of family bonds.

202.    When an agency does not have enough foster homes, the agency is incapable of placing children in safe and appropriate homes. Consequently, children cycle through foster homes, institutions, group placements, and other temporary and emergency placements with disturbing frequency. Some placements may last as long as one day or one week. Children and youth who experience high rates of placement instability are less likely to have educational and medical continuity, maintain meaningful relationships with their families and support systems, or consistently access necessary services. Changes in living arrangements, schools, service providers, and social networks add to the initial trauma children and youth experience after being removed from their homes.

203.    Foster parents are a critical part of the child's care team. They have daily interaction with the child and are best positioned to understand their needs. A well-functioning agency is receptive to recommendations and requests by foster parents. But DCS views foster parent advocacy as adversarial. Upon information and belief, DCS commonly retaliates against foster parents by removing or threatening to remove foster children, by substantiating or threatening to substantiate allegations of abuse and/or neglect against them, and by rescinding or threatening to rescind their foster care licenses.

204.    DCS's treatment of foster parents causes foster parents to stop accepting placements, discourages foster parents from renewing their licenses, and deters prospective foster parents from seeking a license. Consequently, the overall number of placements decreases.

205.    The Child Welfare Policy and Practice Group corroborated this concern in its 2018 evaluation of Indiana DCS: "Diminished trust and inconsistent communication were key concerns identified as reasons foster parents are opting out or are not agreeing to have certain children placed in their homes. Some foster parents said they feared sharing concerns or complaints, as they

46

claimed to have seen children removed in retaliation. Others related having had children for whom they had provided care for years, in some instances since the children were infants or toddlers, removed from them abruptly with no preparation or transition when decisions were made to return them home or place them with another parent or relative. Over the past 24 months, 1,791 foster families voluntarily withdrew their license for various reasons. In April 2018 alone, 18 foster families withdrew." Between March 2021 and March 2022, DCS lost nearly 500 licensed foster homes.

206.    The evaluation adds that, "some barriers to maintaining an adequate number of homes were administrative. An example is the length of time spent by foster parents waiting for licensure approval. A foster parent said that one county is actively telling people 'it will be a year' because they don't have the staff to do the licensing work. Reviewers heard from other foster parents who said that DCS in another county is 'wholesale referring people to [licensed child placing agencies]….'The licensing process for DCS and private providers is different, and some think this is confusing to prospective foster parents."

207.    Additionally, Indiana's foster parents have little to no recourse. The Indiana Foster Parent Bill of Rights is an aspirational statement, not an enforceable contract, and therefore foster parents cannot pursue legal remedies for violations of these rights.

208.    The DCS Ombudsman Bureau is also incapable of addressing foster parent concerns. The DCS Ombudsman is authorized "to receive, investigate, and resolve complaints that allege the department of child services, by an action or omission, failed to protect the physical or mental health or safety of any child or failed to follow specific laws, rules, or written policies," IND. CODE 4-13-19-2 (2023). Although the Ombudsman is touted as an independent state agency, it functions as an arm of DCS and does not achieve the goals that a truly independent agency would

provide. For example, the Ombudsman's policies require foster parents "to address their issues at the local level, by contacting the appropriate family case manager, the family case manager supervisor, the division manager, and the local office director," and if foster parents file a complaint without completing the internal DCS process, the Ombudsman will simply refer the complaint to the local DCS office. This policy exposes foster parents to retaliation by their local DCS office.

209.   Indiana State Representative and Chair of the Child Services Oversight Committee (CSOC), Rep. Edward Clere, expressed similar concerns in a December 7, 2021, CSOC Meeting. Speaking to Director of DCS Ombudsman, Shoshanna Everhart, Rep. Clere said, "I wonder if the process needs to be revisited—if maybe there's a chilling effect for folks who may have a real issue or real concern and are afraid of how that would be perceived or whether it might make things worse…I would assume that folks who are going to the Ombudsman are going to the Ombudsman because they have a problem with their local DCS office. So we're telling them to go to the local DCS office to resolve the problem."

210.   Indiana's crippling placement deficit persists. As Indiana reported in its 2021-2022 Annual Progress and Services Report, "many regions and private agencies have had increased difficulty finding appropriate, least-restrictive placement options for these children that allow them to remain with their siblings and/or within their own communities."

**F.  DCS's failures result in frequent disruptions and placement moves.**

211.   DCS's actions create a negative feedback loop: with every disruption, the child's condition deteriorates; and as the child's condition deteriorates, disruptions are more likely to occur. Consequently, DCS shuttles children between foster homes and institutions with increasing frequency.

212.    The average number of placements has increased 14% since 2017.

213.    Nearly all Named Plaintiffs represent those cases in which the state places the child in a sequence of homes and fails to take steps to prevent the child from deteriorating physically or psychologically as a result of the frequency with which the child is moved about within the foster-home system.

214.    The practice of shuttling children between homes is a symptom of a foster care system that is unable to provide reasonable care and safety for foster children.

**G. DCS's treatment of service providers reduces service availability.**

215.    Child welfare systems must be able to quickly identify children's physical and behavioral health needs, provide high-quality preventative and acute care, track care delivery, and communicate health care information to families, caregivers, and partner agencies. The agency is responsible for ensuring that children in care have their health and dental needs met, including regular, comprehensive evaluations. These screenings and assessments are important to identify health conditions that require prompt medical attention, chronic medical needs, and developmental or behavioral health concerns. To support the child's health, information about a child's health needs and status must be shared immediately with the child's foster parent or caregiver, social worker, and other service providers, so that a treatment plan can be developed.

216.    Agencies typically contract with service providers to fulfill these responsibilities. If there are too few providers and too many children, children will not receive the services needed to ameliorate their health needs.

217.    DCS is aware that the lack of service availability is impacting vital services to children and families. On November 1, 2021, service providers testified before the Child Services Oversight Committee. Rachael Fisher, Executive Director of Community Health Network testified

that her organization "has seen a 53% reduction in care" and that "there simply aren't enough staff members to adequately support the children" despite increases in worker compensation. Dee Szndrowski, CEO of Stop Child Abuse and Neglect (SCAN), testified that her organization has "experienced a turnover rate of 40%" despite "increased paid time off, referral bonuses, incentive programs, and other efforts." Joanna Todd, Residential Program Directors at the Youth Opportunity Center, testified that their "facility has 110 beds but is only filling 64 at the moment due to shortages in staffing."

218.    Upon information and belief, DCS commonly retaliates against service providers that do not support DCS's service or placement recommendations. For example, when a therapist provides a recommendation that is contrary to DCS's interests (e.g. the child should not be placed in an institution), DCS assigns the child to another provider and curtails referrals to the therapist. When a CASA (often individuals with little legal knowledge) provides a recommendation that is contrary to DCS's interests (e.g. the child should not be returned to her abuser on a trial home visit), DCS withholds case information prior to court hearings, preventing the CASA from adequately preparing for hearings. When other service providers provide recommendations contrary to DCS's interests (e.g. the child should continue specialized treatment for PTSD) or report abuse, DCS removes those providers from the case and withholds referrals.

219.    This DCS-created climate of fear erodes the entire services ecosystem. CASAs drop cases and refuse to volunteer again. Therapists either stop working with DCS or make recommendations contrary to their professional judgement. Service providers lose staff, close shop, or rubber stamp DCS decisions. When a service provider contract is terminated (either voluntarily by the provider or involuntarily by DCS), children and families lose services, and other providers are unable to absorb the sudden influx of children and families.

220. The additional administrative and financial burdens imposed by DCS also discourage therapists from contracting with DCS. Unlike in private practice, DCS-contracted therapists must provide therapy notes and regular progress reports to DCS, must input data into DCS's online portal, must respond to DCS's requests for clarification, and are often required to schedule and travel to in-home visits. DCS-contracted therapists are not reimbursed for these administrative tasks; therapists are only reimbursed for face-to-face time, and even then, therapists often spend additional unpaid time seeking outstanding reimbursement payments. As one former DCS-contracted therapist explained, the additional administrative burdens and duplicative work means that "a DCS provider with 100 families has to do everything 200 times."

221. These administrative and financial burdens prevent DCS from attracting therapists with the training and experience necessary to meet the needs of children in foster care. Some estimate that less than 5% of DCS-contracted therapists have greater than 3 years of experience, and that most lack the training and experience necessary to provide specialized treatment to foster children. Consequently, when DCS is finally able to secure a therapist for treatment, the treatment is not recommended for the specific needs of the child. For example, child victims of sexual abuse, like Owen and Sophia, may receive anger management or coping skills therapy instead of treatment for complex trauma.

222. The reduced availability of services prevents children from receiving necessary medical and psychological treatment. Waitlists grow longer and providers more distant. Children who are receiving treatment that does not target the source of their trauma are not receiving insufficient treatment—they are receiving no treatment for their trauma. The untreated trauma places all foster children at significant risk of irreparable harm.

**III.    DCS overrelies on institutional placements for children with disabilities.**

51

223.   The 2018 Child Welfare Group Report ("CWG Report") found that Indiana has a "gap in resources" for children who requires a higher level of care than a foster home, but lower than a residential treatment center, including therapeutic foster homes.

224.   By the time children enter residential care, they have often already bounced between multiple placements, including kinship and non-kinship foster homes, emergency shelter care placements, or short-term residential placements like group homes. Each placement compounds that child's trauma and makes it more difficult to stabilize.

225.   DCS has failed to ensure that children with disabilities in the foster care system have access to medical and mental health and requisite support services to allow them to remain in the least-restrictive, most family-like setting, in foster homes with supportive services. Instead, children with disabilities are often placed in segregated institutional treatment facilities for extended periods of time. DCS has failed to take steps to integrate these children back into the community or ensure that they are placed in environments that can support their needs, often leaving them in overly-restrictive residential placements long after they are recommended for discharge.

226.   Further, children with disabilities who are placed by DCS in child caring institutions are subjected to substandard care and treatment, including excessive physical or chemical restraints, an institutional environment, limited access to accredited educational programs, and limited community access.

227.   DCS is the placement agency and funding source and is responsible for licensing and overseeing these conditions and practices. Because of this conflict of interest, DCS has little

incentive to improve the conditions as they are reliant upon the institutions for bed availability for foster children that are difficult to place.

228.     The failures in Indiana's use of residential placements substantially depart from widely-accepted professional standards and demonstrate a deliberate indifference to the risk of harm to the Plaintiffs and the classes they represent.

## CLASS ACTION ALLEGATIONS

229.     This action is properly maintained as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure.

230.     This action consists of one general class and one subclass:

    a.   A class comprised of all children for whom Indiana DCS has or will ever have legal responsibility and/or a special relationship in the context of the child protection system ("General Class").

    b.   A subclass comprised of all members of the General Class who have or will have emotional, psychological, cognitive, or physical disabilities ("ADA Subclass").

## Numerosity: Fed. R. Civ. P. 23(a)(1)

231.     Each class is sufficiently numerous to make joinder impracticable. The General Class consists of at least 11,000 children who are in the legal and/or physical custody of DCS and/or with whom DCS has a special relationship. Over 8,500 of these children are in out-of-home care.

232.     The ADA Subclass consists of thousands of children with disabilities who are or will become a ward of DCS and who, because of a disability, are at a higher risk of being placed

in overly-restrictive institutional settings or are currently placed in overly restrictive institutional settings.

**Typicality: Fed. R. Civ. P. 23(a)(3)**

233.    The claims of the Named Plaintiffs are typical of those of the General Class and the ADA Subclass Class, as their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the subclass's claims.

234.    The claims of the Named Plaintiffs are typical of those of the General Class and the ADA Subclass Class, as their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the subclass's claims.

235.    The questions of fact and law raised by named Plaintiffs are common and typical of each putative member of the classes whom they seek to represent.

236.    Questions of fact common to the General Class include:

    a.    whether Defendants fail to maintain an adequate recordkeeping system;

    b.    whether Defendants fail to maintain a system that ensures that foster children receive timely and appropriate medical care;

    c.    whether Defendants fail to recruit and retain sufficient number and diversity of foster care homes;

    d.    whether Defendants fail to maintain a system that protects foster children from physical, psychological, and emotional harm; and

    e.    whether Defendants fail to maintain a system that provides permanency to foster children within a reasonable period of time.

237.    Questions of fact common to the ADA Subclass include:

a.  whether Defendants operate a system that maintains an adequate diversity of placements to permit the members of the ADA Subclass to reside in the most integrated, least restrictive, and most family-like environment;

b.  whether Defendants deprive members of the ADA Subclass necessary and appropriate services and treatment to ensure access to stable, family-like foster placements in the least restrictive environments;

c.  whether Defendants have failed to provide appropriate, community-based services or programs to the members of the ADA Subclass in order to support their needs in the community and prevent unnecessary and prolonged institutionalization;

d.  whether Defendants have placed an over-reliance on institutional settings for members of the ADA Subclass and have failed to create a realistic permanency plan that does not include institutionalization; and

e.  whether Defendants have violated the rights of the plaintiffs within the ADA Subclass by administering the State's foster care system in a manner that denies qualified children with disabilities the benefits of the State's services, programs, or activities in the most integrated setting appropriate to their needs, and by failing to reasonably modify the State's foster care system to avoid discrimination against children with disabilities.

238.    The claims of the Named Plaintiffs are typical of those of the Classes, as their claims arise from the same policies, practices, or courses of conduct; and their claims are based on the same theory of law as the class's claims.

239.    Questions of law common to the General Class include:

a. whether Defendants' systemic failures violate Plaintiffs' rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997;

b. whether Defendants' systemic failures violates the Due Process Clause of the Fourteenth Amendment; and

c. whether Defendants' systemic failures violate Plaintiffs' right to a permanent home and family, as well as their right to be free from harm and have their basic needs met under the First, Ninth, and Fourteenth Amendments to the U.S. Constitution.

240.  Questions of law common to the ADA Subclass include:

a. whether Defendants' systemic failures violate Plaintiffs' rights under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131(2), Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794, and the respective implementing regulations; by unnecessarily placing youth with disabilities, or placing them at risk thereof, in institutional settings and denying them access to meaningful, individualized, and appropriate community-based treatment and supports.

**Adequacy: Fed. R. Civ. P. 23(a)(4)**

241.  The named Plaintiffs will fairly and adequately protect the interests of the classes that they seek to represent. Defendants have acted or failed to act on grounds generally applicable to all members of the classes, necessitating class-wide declaratory and injunctive relief. Counsel for Plaintiffs know of no conflict among the class members. The named Plaintiffs and Plaintiff

Children are represented by counsel experienced in class action litigation, child welfare litigation, and complex litigation.

   a.  Marcia Robinson Lowry, Anastasia Benedetto, and David Baloche, attorneys with A Better Childhood, Inc., a non-profit legal organization, which has extensive experience and expertise in federal child welfare actions throughout the U.S.;

   b.  Kimberly Kennedy, an attorney with SouthBank Legal, which has extensive experience and expertise in federal litigation in Indiana and throughout the U.S.; and

   c.  Aaron Marks and Kelsey Bleiweiss, attorneys with Kirkland & Ellis LLP, which has extensive experience and expertise in federal class actions throughout the U.S.

**Fed. R. Civ. P. 23(b)(1)(A) and (B)**

242.   This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of General Class members is approximately 11,500, and the prosecution of separate actions by individuals would create a risk of inconsistent and varying adjudications, which in turn would establish incompatible standards of conduct for Defendants. Additionally, the prosecution of separate actions by individual members could result in adjudications with respect to individual members that, as a practical matter, would substantially impair the ability of other members to protect their interests.

**Fed. R. Civ. P. 23(b)(2)**

243.   This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants' policies, practices, actions, and omissions that form the basis of this

complaint are common to and apply generally to all members of the Classes, and the injunctive and declaratory relief sought is appropriate and will apply to all members of the class.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Substantive Due Process under the U.S. Constitution**
**(Asserted by the General Class Against Defendants Holcomb and Miller)**

244.    Each of the foregoing allegations is incorporated as if fully set forth herein.

245.    A state assumes an affirmative duty under the Fourteenth Amendment to the U.S. Constitution to provide reasonable care to, and to protect from harm, a child with whom it has formed a special relationship.

246.    The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom that is inconsistent with the exercise of accepted professional judgment, is objectively unreasonable under the facts and circumstances, and amounts to deliberate indifference to the constitutionally protected liberty and privacy interests of all of the members of the General Class. Defendants are well aware and should have been aware of the policies and practices in place, which prevent these class members from receiving adequate protection from physical and psychological harm after the State has formed a special relationship with them. As a result, the named Plaintiffs and all of the members of the class of children to whom the state owes a special duty, children who have a special relationship with Defendants, including wards of DCS, have been, and are, at risk of being deprived of their substantive due process rights conferred upon them by the Fourteenth Amendment to the U.S. Constitution.

247.    These substantive due process rights include, but are not limited to:

   a.   the right to freedom from maltreatment and repeated maltreatment, while under the protective supervision of the State;

   b.   the right to protection from unnecessary intrusions into the child's emotional wellbeing once the State has established a special relationship with that child;

   c.   the right to services necessary to prevent unreasonable risk of harm;

   d.   the right to conditions and duration of foster care reasonably related to the purpose of government custody;

   e.   the right not to be maintained in custody longer than is necessary to accomplish the purpose to be served by taking a child into government custody; and

   f.   the right to treatment and care consistent with the purpose and assumptions of government custody.

<u>**SECOND CAUSE OF ACTION**</u>

**The Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 *et seq*.**
**(Asserted by the General Class Against Defendants Holcomb and Miller)**

248.   Each of the foregoing allegations is incorporated as if fully set forth herein.

249.   The foregoing actions and inactions of Defendants constitute a policy, pattern, practice, and/or custom of depriving the named Plaintiffs and the classes they represent of the rights contained in the Child Welfare Act of 1980, as amended by the Adoptive and Safe Families Act of 1997, to:

   a.   a written case plan that contains the health records of the child, including the child's known medical problems, the child's medications, and other relevant health information concerning the child, 42 U.S.C. §§ 671(a)(16), 675(1)(C)(v)-(vii).

59

b.  a procedure for assuring that a child's health record is reviewed and updated, and that a child's updated health record is provided to the foster parent or foster care provider at the time of placement, 42 U.S.C. §§ 671(a)(16), 675(5)(D).

c.  a written case plan that includes a plan to provide safe, appropriate and stable placements, 42 U.S.C. §§ 671(a)(16), 675(1)(A);

d.  a written case plan that ensures that the child receives safe and proper care while in foster care and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B);

e.  a written case plan that ensures provision of services to parents, children, and foster parents to facilitate reunification, or where that is not possible, the permanent placement of the child and implementation of that plan, 42 U.S.C. §§ 671(a)(16), 675(1)(B); and

f.  a case review system in which each child has a case plan designed to achieve safe and appropriate foster care placements in the least restrictive and most family-like setting, closest to their home community, 42 U.S.C. §§ 671(a)(16), 675(5)(A).

250.  These provisions of the Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, are clearly intended to benefit Plaintiffs and the classes they represent; the rights conferred are neither vague nor amorphous such to strain judicial competence; and the statute imposes a binding obligation on the states. 42 U.S.C. § 1983.

251.  Defendants have been aware, should have been aware, are aware, and should be aware of all of the deprivations complained of herein, and Defendants have been deliberately indifferent to such conduct, failing to take steps to abate the harm as a reasonable official would.

## THIRD CAUSE OF ACTION

### Americans with Disabilities Act and Rehabilitation Act
### (Asserted by the ADA Subclass Against Defendants)

252.    Each of the foregoing allegations is incorporated as if fully set forth herein.

253.    Title II of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12132, and its enabling regulations, 28 C.F.R. 35.101 *et seq.*, prohibit discrimination against individuals with disabilities.

254.    ADA Subclass Plaintiffs have behavioral, developmental and psychiatric disabilities, which qualify them as individuals with disabilities within the meaning of the ADA, 42 U.S.C. § 12132(2) and "otherwise qualified individuals with a disability" under the Rehabilitation Act, 29 U.S.C. § 794; 29 U.S.C. § 705(20). They meet the essential eligibility requirements for the receipt of foster care services provided by DCS.

255.    Defendants are public entities, or public officials of a public entity, subject to the provisions of the ADA, 42 U.S.C. § 12132(1)(A). Such entities also receive federal financial assistance and are thus subject to the requirements of the Rehabilitation Act. 29 U.S.C. § 794(b); 34 C.F.R. 104.51. Defendants Holcomb and Miller are sued in their official capacities as state officials responsible for administering and/or supervising Indiana programs and activities related to foster care services.

256.    Title II of the ADA prohibits a public entity from excluding a person with a disability from participating in, or denying the benefits of, the goods, services, programs and activities of the entity or otherwise discriminating against a person on the basis of his or her disability.

257. Likewise, the Rehabilitation Act and its enabling regulations prohibit discrimination in the provision of services by any entity receiving federal funding. 34 C.F.R. 104.4(b)(1)(ii), (b)(2); 34 C.F.R. 104.52(a)(2).

258. Under the regulations enforcing the ADA, the state may not "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others . . . ." 28 C.F.R. § 35.130(b)(1)(iii).

259. Accordingly, DCS must provide children with disabilities an equal opportunity to access foster care services, in the least restrictive appropriate setting, as it provides to children without disabilities in its custody.

260. Moreover, Defendants have an affirmative duty to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

261. As set forth above, the regulatory hallmark and guiding force of disability law is the provision of services, including the child's placement in the most integrated environment appropriate to the youth's needs. 28 C.F.R. § 35.130(d); 34 C.F.R. 104.4(b)(2); *see also Olmstead v. L.C.*, 527 U.S. 581, 602 (1999).

262. As a direct and proximate result of Defendants' violations of Title II of the ADA and the Rehabilitation Act, Plaintiffs have been or are at risk of being placed in overly restrictive settings and subjected to unnecessary trauma because of their disabilities, as set forth above, and

will continue to suffer injury until Defendants are required to, and have, come into compliance with the requirements of the ADA and Rehabilitation Act.

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Plaintiffs respectfully request that this Honorable Court:

I.      Assert jurisdiction over this action;

II.     Order the Plaintiff Children may maintain this action as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

III.    Pursuant to Rule 57 of the Federal Rules of Civil Procedure, declare unconstitutional and unlawful:

      a. Defendants' violation of Plaintiff Children's right to be free from harm under the Fourteenth Amendment to the U.S. Constitution;

      b. Defendants' violation of Plaintiff Children's rights under the Adoption Assistance and Child Welfare Act of 1980, as amended by the Adoption and Safe Families Act of 1997, 42 U.S.C. § 670 *et seq*.;

      c. Defendants' violation of Plaintiff Children's rights under Title II of the Americans with Disabilities Act, as amended, 42 U.S.C. § 12132, and the Rehabilitation Act, 29 U.S.C. § 794; and,

IV.     Permanently enjoin Defendants from subjecting Plaintiff Children to practices that violate their rights, including:

      a. Require that DCS establish a process to ensure that all children in the custody of DCS receive timely and appropriate services and treatment, including, but not limited to, immediate referral for specialized psychological treatment for children

63

removed based on allegations of sexual abuse, and immediate referral for psychological evaluation and potential treatment for children removed based on allegations of physical and emotional abuse, within 48 hours of removal.

b.  Require that DCS recruit and retain an adequate number of qualified and trained caseworkers, ensure that caseloads do not exceed the professional standards set by the Child Welfare League of American and the Council on Accreditation, conduct a workload analysis and implement workload standards, and periodically report caseloads using a methodology that accurately reflects workloads.

c.  Require that DCS ensure foster parents and adoptive parents are provided with a child's full and accurate medical information prior to or at the time of placement;

d.  Require that DCS establish a recordkeeping system sufficient to maintain and update medical records for all children in DCS custody;

e.  Require that DCS ensure that all children placed in DCS custody receive at least monthly face to face visits, including time outside the presence of the child's caregiver, with the majority of those visits in the child's placement;

f.  Require that DCS conduct face-to-face visitation, including time out of the presence of the child's custodian, and continuation of services for all children placed on trial home visits, twice per month with at least one visit occurring in the home;

g.  Require that DCS establish a process to ensure that all children with physical, mental, intellectual, or cognitive disabilities have an opportunity to receive community-based foster care services in the most integrated setting appropriate to the child's needs, including, in as many instances as is required by reasonable

professional standards, family foster homes and therapeutic foster homes with supportive services;

h.  Develop and implement a policy that prohibits retaliation against foster parents who request services for children placed with them;

i.  Develop and implement a placement matching process for the placement of children in appropriate homes or programs that can meet their needs;

j.  Require that DCS conduct annual record reviews of random samples of children's cases to measure placement stability and permanence, and make such data publicly available;

k.  Require that DCS contract with an outside entity to complete a needs assessment of the state's provision of foster care placement and services no later than six months after judgment to determine the full range and number of appropriate foster care placements and services for all children needing foster care placement, including the development of a plan, with timetables, within which such placements and services shall be secured, and ensure that DCS shall comply with these timetables.

V.  Award Plaintiff Children the reasonable costs and expenses incurred to litigate this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920 and 42 U.S.C. § 1988, and the Federal Rules of Civil Procedure 23(e) and (h).

VI.  Grant such other and further equitable relief as the Court deems just, necessary and proper to protect Plaintiff Children from further harm while in Defendant Miller's custody in foster care.

Dated: August 16, 2023

Respectfully submitted,


s/ Kimberly Kennedy_____
Kimberly Kennedy, No. 37547-71
SouthBank Legal
100 E. Wayne Street, Suite 300
South Bend, IN 46601
Telephone: 574-968-0760
Facsimile: 574-968-0761
kkennedy@southbank.legal

Marcia Robinson Lowry (*pro hac vice pending*)
Anastasia Benedetto (*pro hac vice pending*)
David Baloche (*pro hac vice pending*)
A Better Childhood
355 Lexington Avenue, Floor 16
New York, NY 10017
Telephone: (646) 795-4456
Facsimile: (212) 692-0415
mlowry@abetterchildhood.org
abenedetto@abetterchildhood.org
dbaloche@abetterchildhood.org

Aaron Marks (*pro hac vice pending*)
Kirkland & Ellis, LLP
601 Lexington Avenue New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
aaron.marks@kirkland.com

Kelsey Bleiweiss (*pro hac vice pending*)
Kirkland & Ellis, LLP
300 North LaSalle, Chicago, IL 60654
Telephone: (312) 862-3044
Facsimile: (312) 862-2200
kelsey.bleiweiss@kirkland.com